IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
NEWNAN DIVISION

UNITED STATES OF AMERICA

v.                                                    CRIMINAL CASE NO.

                                                      3:10-CR-004-JEC-RGV

ANTHONY MADDOX

**ORDER FOR SERVICE OF MAGISTRATE JUDGE'S
FINAL REPORT AND RECOMMENDATION**

Attached is the Report and Recommendation of the United States Magistrate Judge made in accordance with 28 U.S.C. § 636(b)(1) and N.D. Ga. Crim. R. 58.1(A)(3)(a) and (b).  Let the same be filed and a copy, with a copy of this Order, be served upon counsel for the parties.

Pursuant to 28 U.S.C. § 636(b)(1), each party may file written objections, if any, to the Report and Recommendation within fourteen (14) days of receipt of this Order.  Should objections be filed, they shall specify with particularity the alleged error(s) made (including reference by page number to the transcript if applicable) and shall be served upon the opposing party.  The party filing objections will be responsible for obtaining and filing the transcript of any evidentiary hearing for review by the District Court.   If no objections are filed, the Report and Recommendation may be adopted as the opinion and order of the District Court and

any appellate review of factual findings will be limited to a plain error review. United States v. Slay, 714 F.2d 1093, 1095 (11th Cir. 1983) (per curiam).

Pursuant to Title 18, U.S.C. § 3161(h)(1)(F), **the above-referenced fourteen (14) days allowed for filing objections is EXCLUDED from the computation of time under the Speedy Trial Act, whether or not objections are actually filed.** The Clerk is **DIRECTED** to submit the Report and Recommendation with objections, if any, to the District Court after expiration of the above time period.

**IT IS SO ORDERED and DIRECTED**, this 7th day of September, 2010.


RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
NEWNAN DIVISION

UNITED STATES OF AMERICA

v.

ANTHONY MADDOX

CRIMINAL CASE NO.

3:10-CR-004-JEC-RGV

## MAGISTRATE JUDGE'S FINAL REPORT AND RECOMMENDATION

Defendant Anthony Maddox ("Maddox") is charged in a single-count indictment with assaulting a person having lawful charge, control and custody of mail matter, money, and other property of the United States, with intent to rob, steal and purloin said mail, money or property, in violation of 18 U.S.C. § 2114. [Doc. 9]. Maddox  has moved to suppress evidence and statements obtained by law enforcement subsequent to his arrest, including evidence obtained during a consent search of his bedroom in his mother's home.  [Docs. 19 & 20].  Following an evidentiary hearing on the motions, the parties filed post-hearing briefs, [Docs. 27, 32 & 33], and the matter is now ready for ruling.[1]  For the following reasons, the

---

[1] See Doc. 25 for the transcript of the evidentiary hearing.  Citations to the evidentiary hearing transcript hereinafter will be referred to as "(Tr. at ___)."  In addition, the parties submitted exhibits at the May 26, 2010, hearing, which will be referred to as "(Gov. Ex. ___)" for the government's exhibits and "(Def. Ex. ___)" for defendant's exhibits.

undersigned Magistrate Judge **RECOMMENDS** that Maddox's motions to suppress evidence and statements [Docs. 19 & 20] be **DENIED**.

## I.  STATEMENT OF FACTS

On the night of January 29, 2010, Postal Inspector Daryl Greenberg ("Inspector Greenberg") of the United States Postal Inspection Service ("USPIS") responded to the U.S. Post Office in Fayetteville, Georgia, to investigate the robbery of Glenn Ellis ("Ellis"), a Highway Contract Route driver employed by H&H Transportation and under contract with the U.S. Postal Service.  (Tr. at 6-7; Gov. Ex. 10 at 2).  Around 7:00 p.m. that evening, Ellis was at the Fayetteville post office picking up mail to be delivered to the Atlanta Postal Distribution Center in Atlanta, Georgia. (Gov. Ex. 10 at 2).  While Ellis was loading his truck at the loading dock, two individuals approached and robbed him of three Registered Remittance bags containing $17,348.00 in cash (primarily in $20 and $100 denominations), $9,835.88 in checks, and a Registered Mail bag containing a diamond engagement ring.  (Id.).

Fayetteville Police Department officers responded to the scene and used tracking dogs who followed a trail through the woods adjacent to the loading dock to a nearby parking lot.  (Id.).  A local business owner interviewed by investigators reported seeing a faded black Ford Ranger pickup with a spare tire on one of the rear wheels parked in that same parking lot earlier in the day.  (Id.).  Investigators also recovered two shoe prints of a Nike Air Force One tennis shoe: one on the loading dock, and one inside the rear of Ellis' tractor trailer.  (Id.).

After further investigation, Inspector Greenberg learned that defendant Maddox, a former H&H Transportation employee, owned a black Ford Ranger pickup.  (Id.; Tr. at 10).  Maddox had been fired from H&H in September, 2009.  (Gov. Ex. 10 at 3).   Inspector Greenberg also determined that Maddox had driven the route that included the Fayetteville post office while employed by H&H under contract to the U.S. Postal Service, and therefore, Maddox was familiar with the Fayetteville post office, the surrounding area, the types of mail transported, and the procedures Ellis used to pick up mail.  (Gov. Ex. 10 at 2-3).  Inspector Greenberg conducted a subsequent interview with Ellis, who was familiar with Maddox's appearance and voice, and Ellis confirmed that Maddox could have been one of the robbers based on his physical description.  (Id.).  Ellis stated that one of the robbers who was the same size and build as Maddox never spoke.  (Id.).  Ellis said that if the silent robber had spoken, he would have been able to determine whether the robber was Maddox due to his distinctive voice.  (Id.).

Investigators established surveillance at Maddox's mother's home at 3745 Windmill Road, Ellenwood, Georgia, on February 2, 2010, and observed a black Ford Ranger pickup with a spare tire on one of the rear wheels parked outside of the residence.  (Id. at 2-3).  Inspector Greenberg showed a photo of this pickup taken by investigators to the witness who had initially given the description, and the witness positively identified it as the same vehicle she had seen in the nearby parking lot on the night of the robbery.  (Tr. at 10; Gov. Ex. 4 at 2-3, 5; Gov. Ex. 10 at 2-3).

3

Inspector Greenberg also determined that Maddox and his wife, Latoya King Maddox ("King"), had been arrested in December 2009 in the same 1991 Ford Ranger pickup observed outside the Windmill Road residence. (Gov. Ex. 10 at 4). A records check of King's driver's license revealed that she had applied for a license renewal on December 22, 2009, listing her address as 5595 Attucks Blvd. in Morrow, Georgia. (Id.). Investigators began surveillance on the Attucks Blvd. residence and observed a man matching Maddox's description driving a 2001 GMC Yukon XL to the residence. (Id.). They also observed the same man affixing a license tag to the Yukon bearing number WX90PF, which a records check revealed belonged to King and Maddox for a vehicle registered on February 5, 2010, that was purchased on February 4, 2010, from Garcia Trucks Auto Sales in Austell, Georgia. (Id.; Doc. 5 at 4, 5; Tr. at 11).

Investigators obtained the bill of sale for the Yukon, and it showed that the buyers paid $7,933.65 in cash for the vehicle, and copies of both Maddox's and King's Georgia driver's licenses were included in the sale paperwork. (Tr. at 11; Gov. Ex. 10 at 4). The owner and salesperson at Garcia trucks told investigators that King and Maddox had purchased the vehicle using almost all $20 bills with a few $100 bills that they removed from a satchel containing yet more cash. (Gov. Ex. 10 at 4). Furthermore, the owner and salesperson told investigators that King and Maddox had not test-driven the vehicle, and that they appeared nervous and in a hurry. (Id.).

4

On February 10, 2010, investigators assigned to conduct surveillance on Maddox and King followed the couple from the Attucks Blvd. residence to Southlake Mall.  (Id.).  They observed the couple go into the mall and return more than an hour later carrying several shopping bags.  (Id.).  Investigators photographed King, who was wearing a ring with large, clear gemstones on her left hand.  (Id. at 5).  Investigators enlarged photographs of King's hand and the ring and showed the photos to the owners of the ring taken during the robbery.  (Id.).  The owners said that the ring on King's hand shown in the enlarged photographs appeared to be the same unique, handcrafted ring they had mailed on January 29, 2010.  (Id.; Tr. at 15).  When King was arrested in December 2009, her jewelry inventoried at the jail did not included a ring similar to the one photographed.  (Gov. Ex. 10 at 5; Tr. at 5).  Georgia Department of Labor records showed that King had made only $9,229.78 in 2009 and had no record of employment beyond the third quarter of 2009.  (Gov. Ex 10 at 4).  Credit checks through Equifax showed no new credit checks, purchases, or financing through any jewelry store for either King or Maddox.  (Gov. Ex. 10 at 5).

On February 11, 2010, Inspector Greenberg applied for and obtained search warrants for the Attucks Blvd. residence, the Ford Ranger pickup, and the GMC Yukon.  (Tr. at 8; Gov. Exs. 1-6).  Inspector Greenberg and approximately eleven other law enforcement officers executed the three search warrants at the Attucks Blvd. residence between 6:45 and 7:00 a.m. on the morning of February 18, 2010.  (Tr.

5

at 11).  All law enforcement agents present were armed and wearing either police uniforms or tactical attire with ballistic vests and police markings.  (Id. at 12, 39). Inspector Greenberg and two other officers attempted to serve the search warrants at the front door of the residence, knocking loudly on the door and announcing "Police," "Law Enforcement," "Come to the door" and similar phrases for approximately one minute.  (Id. at 13, 40, 54-55).  Though the officers heard movement inside, no one came to the door.  (Id. at 13, 40).  Officers then breached the side door of the residence and detained the occupants, including King, Maddox, King's mother and father, King's brother, and King and Maddox's two children.  (Id. at 13-14, 41).  King and Maddox were handcuffed and seated in separate law enforcement vehicles parked outside the residence while all of the other occupants were detained in the living room for the duration of the search.  (Id. at 13-14, 44).

Inspector Greenberg advised King of her <u>Miranda</u>[2] rights and obtained a signed waiver before interviewing her for approximately one hour.  (Id. at 14). During this time, no investigators or officers spoke to Maddox about the crime, and he remained handcuffed and seated in the vehicle outside the Attucks Blvd. residence.  (Id. at 14, 16, 44).  King told Inspector Greenberg during the interview that the ring he was looking for was in her bedroom on top of a jewelry box.  (Id. at 15-16).  At Inspector Greenberg's direction, one of the agents conducting the search

---

[2] <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

retrieved a ring from on top of the jewelry box in the bedroom.  (<u>Id.</u> at 16).  Inspector

Greenberg compared the ring found in the bedroom with the photos of the stolen

ring, and determined that the recovered ring was the same as the one depicted in the

photographs.  (<u>Id.</u> at 18, 44-45).  At this time, Inspector Greenberg decided to place

Maddox under arrest and have him transported to his office, fifteen minutes away

from the Attucks Blvd. residence.  (<u>Id.</u> at 18-19).  Another officer transported

Maddox while Inspector Greenberg remained at Attucks Blvd. to finish interviewing

King.  (<u>Id.</u>).  Maddox was placed in an interview room at the USPIS office until

Inspector Greenberg arrived to conduct the interview at 9:37 a.m.  (<u>Id.</u> at 19).

Inspector Greenberg interviewed Maddox in the USPIS interview room with

another agent, Diane Flowers ("Flowers") present.  (<u>Id.</u>).  Inspector Greenberg read

Maddox his <u>Miranda</u> rights from a standardized USPIS form prior to interviewing

him.  (<u>Id.</u>; Gov. Ex. 7).  Maddox gave a "yes" response when Inspector Greenberg

asked if he understood each of the bulleted points on the form corresponding to

each of the <u>Miranda</u> rights as follows:

- You have a right to remain silent.
- Anything you say can be used against you in court.
- You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning.
- If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.
- If you decide to answer questions without a lawyer present, you will still have the right to stop answering questions at any time.  You have the right to stop answering questions at any time until you talk to a lawyer.

(Tr. at 20; Gov. Ex. 7).  Maddox then signed the form on two lines at 9:38 a.m.: first under a paragraph reading "I have read this statement of my rights (This statement of my rights has been read to me) and I understand what my rights are," and second under a paragraph reading "I am willing to discuss subjects presented and answer questions. I do not want a lawyer at this time. I understand and know what I am doing.  No promises or threats have been made to me and no pressure or coercion of any kind has been used against me."  (Tr. at 20-22; Gov. Ex. 7).  Inspector Greenberg, and Flowers then signed the form and began interviewing Maddox. (Tr. at 22; Gov. Ex. 7).

During the interview, Maddox told Inspector Greenberg that he had been staying at his mother's house on Windmill Road in Ellenwood, Georgia over the past week, that he had a room in the house, had a key, and knew the alarm code.  (Tr. at 25, 48-49).   Approximately an hour and a half after the interview had begun, Inspector Greenberg asked Maddox for consent to search his bedroom at the Windmill Rd. residence, and Maddox agreed, signing a USPIS standardized "Consent to Search" form.  (Tr. at 26-27; Gov. Ex. 8).  Inspector Greenberg and Flowers drove Maddox to the Windmill Road residence, a trip of approximately 20 minutes, while Maddox remained handcuffed in the rear of the USPIS vehicle.  (Tr. at 28-29).  Inspector Greenberg, Flowers, and Maddox arrived at the Windmill Road residence at approximately 11:30 a.m. and met four other USPIS agents there.  (Id.). Inspector Greenberg removed Maddox's handcuffs and handcuffed his hands in

front of his body to allow him to unlock the front door and deactivate the alarm, which Maddox did.  (<u>Id.</u> at 29).  Maddox pointed out his bedroom to the searching agents, and remained about 20 feet from the bedroom seated on a couch under the watch of an agent who was under instructions to relay any objection or withdrawal of consent to the searching agents.  (<u>Id.</u> at 29).  While searching the bedroom, the searching agents located a pair of Nike Air Force One tennis shoes that Inspector Greenberg believed matched the shoe prints found at the scene of the robbery.  (Tr. at 30; Gov. Ex. 9).  Inspector Greenberg then asked Maddox for consent to search the attic and the garage, which Maddox gave verbally, and added his initials to the "Consent to Search" form where Inspector Greenberg had added "Attic + Garage" to the form.  (Tr. at 31-32; Gov. Ex. 9).  The searching agents looked in the attic and garage for approximately one minute, but did not seize any evidence.  (Tr. at 31-32).  The search of the Windmill Road residence concluded at 11:50 a.m., approximately 30 minutes after agents had arrived.  (Tr. at 33).  Inspector Greenberg allowed Maddox to re-arm the alarm and lock the house before transporting Maddox back to the USPIS office to continue interviewing him.  (<u>Id.</u>).

After a restroom break, Inspector Greenberg continued to interview Maddox at the USPIS office until approximately 1:00 p.m.  (<u>Id.</u> at 33-35).  During the second phase of interviewing Maddox, Inspector Greenberg confronted Maddox about the inconsistencies in his story, told Maddox he thought he had committed the robbery, and told him he thought he was lying.  (<u>Id.</u> at 34).  Maddox did not admit to

committing or being involved in the robbery, and admitted only to having possession of the ring. (Id.). Maddox was fingerprinted, photographed, and transported to Atlanta pretrial. (Id. at 35). After being housed overnight at the Atlanta Detention Center, Maddox made his initial appearance the next morning in federal court. (Id. at 36).

## II.  DISCUSSION

Maddox seeks to suppress "all statements and evidence unconstitutionally obtained on the date of [his] arrest" and "all evidentiary fruits obtained through the exploitation of the illegal arrest, interrogation, and search."[3] [Doc. 32 at 1]. Maddox raises challenges to the legality of the seizure of his person that occurred when he was detained and arrested at the Attucks Blvd. residence during the execution of the search warrant. [Doc. 19 at 1-2; Doc. 32 at 6-10]. He also challenges the legality of the consent search of the Windmill Road residence. [Doc. 20 at 2; Doc. 32 at 10-12]. Finally, Maddox has moved to suppress statements obtained during the custodial interrogation in violation of the requirements of Miranda.[4] [Doc. 19 at 2-3].

---

[3] Because agents had a search warrant for the Attucks Blvd. residence, no evidence seized from this location could be considered fruits obtained through Maddox's detention or arrest. See [Doc. 33 at 1-2]. Therefore, the only evidence within the scope of Maddox's motions to suppress at this time are his statements made after arrest and the Air Force One tennis shoes seized during the consent search of the Windmill Road residence.

[4] Maddox has not briefed the third issue related to Miranda, but this Report and Recommendation will briefly address the admissibility of statements obtained

### A.      Legality of detention and arrest

Maddox argues that his initial detention was a *de facto* arrest due to the fact that he was separated from the other residents of the home, handcuffed, and placed in a police car when other, less restrictive means could have been used to provide for an orderly and safe execution of the search warrant at the Attucks Blvd. residence.   [Doc. 32 at 7-9].   Maddox asserts that this *de facto* arrest was not supported by probable cause, and that it was "merely a ploy to advance ancillary investigative interests."   [Id. at 8].   Maddox also contends that the Postal Inspectors lacked probable cause to arrest him even after the ring was discovered due to the fact that no expert testimony established that the ring recovered was the same as the ring reported stolen during the robbery, and the ring's uniqueness was merely "conjectural."   [Id. at 10].

### 1.      *Initial detention during execution of the search warrant*

During the execution of a search warrant, law enforcement may lawfully detain occupants of a home who are present at the time the warrant is served. Muehler v. Mena, 544 U.S. 93, 98 (2005) (citing Michigan v. Summers, 452 U.S. 692 (1981)).[5]  Law enforcement's "authority to detain [occupants] incident to search [of

during the custodial interrogation.

[5] Detention of occupants is appropriate "because the character of the additional intrusion caused by detention is slight, and because the justifications for

a residence] is categorical" and "does not depend on the 'quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure.'" Id., 544 U.S. at 98 (2005) (citing Summers, 452 U.S. at 692).  Law enforcement agents executing the search warrant at Attucks Blvd. were therefore justified in detaining Maddox and the other occupants of the home for the duration of the search, even in the absence of probable cause.

**2.**     *Handcuffing Maddox and placing him in the police car*

Law enforcement officers may use reasonable force to restrain individuals being detained during the execution of a search warrant.  Muehler, 544 U.S. at 98-99 ("Inherent in *Summers'* authorization to detain an occupant of the place to be searched is the authority to use reasonable force to effectuate the detention.") (citing Graham v. Connor, 490 U.S. 386, 396 (1989)); United States v. Hastamorir, 881 F.2d 1551, 1556-57 (11th Cir. 1989) ("[P]olice may take reasonable action, based on the circumstances to protect themselves during investigative detentions.").  Though the use of handcuffs constitutes an additional and separate intrusion from the initial

---

detention are substantial."  Muehler, 544 U.S. at 98 (citing Summers, 452 U.S. at 701). Justifications provided by the Supreme Court in Muehler and Summers include "preventing flight in the event that incriminating evidence is found; minimizing the risk of harm to the officers; and facilitating the orderly completion of the search, as detainees' self-interest may induce them to open locked doors or locked containers to avoid the use of force."  Muehler, 544 U.S. at 98 (quoting Summers, 452 U.S. at 702-703) (internal marks omitted).

detention, use of handcuffs is justified when there are sufficient safety concerns to make the use of handcuffs reasonable.[6]

Like the use of handcuffs, securing a detainee in the rear seat of a police vehicle is an additional restraint that must be reasonable in order to comply with Fourth Amendment prohibitions against unreasonable search and seizure. Kapperman, 764 F.2d 786, 790 n.4. Seating a detainee in the rear of a police vehicle does not by itself elevate a detention to an arrest so long as the level of restraint imposed or force used is reasonable considering the circumstances. Id. See also United States v. Bradshaw, 102 F.3d 204, 211-12 (6th Cir. 1996) ("Detention in a police car does not automatically constitute an arrest); United States v. Parr, 843 F.2d 1228, 1230 (9th Cir. 1988) (holding that there is "no per se rule that detention in a

---

[6] Muehler, 544 U.S. at 99 (citing the presence of drugs, weapons, or multiple occupants as concerns that justify handcuffing an occupant of a residence being searched); United States v. Kapperman, 764 F.2d 786, 790 n.4 (11th Cir. 1985) ("[N]either handcuffing nor other restraints will *automatically* convert a *Terry* stop into a *de facto* arrest requiring probable cause."); Bradley v. West, No. 2:03-cv-97-WKW, 2007 WL 896274, at *6 (M.D. Ala. Mar. 22, 2007) ("The imposition of correctly applied handcuffs to effectuate detention during a search is, in appropriate circumstances, a reasonable application of force."). See also Washington v. Lambert, 98 F.3d 1181, 1186 (9th Cir. 1996) (use of handcuffs to restrain the occupant of a residence being searched was permissible where it was "a reasonable response to legitimate safety concerns on the part of the investigating officers.") (emphasis omitted); United States v. Bautista, 684 F.2d 1286, 1289-90 (9th Cir. 1982) (handcuffing of potentially armed and dangerous bank robbery suspects during investigative detention justified by officer safety concerns and not sufficient to convert investigative detention into a *de facto* arrest).

patrol car constitutes an arrest"); United States v. Manbeck, 744 F.2d 360, 377 (4th Cir. 1984) (person detained during traffic stop and seated in the back of a patrol car for the duration of the stop did not elevate a detention to an arrest where safety concerns and inclement weather "made it unreasonable to detain [the detainee] anywhere else but in the patrol car").

While Maddox correctly notes that law enforcement's motives in sequestering him are relevant,[7] so long as it was reasonable under the circumstances to detain Maddox during the execution of the search warrant by handcuffing and seating him in the rear of a police car, he was not subjected to an illegal detention or a *de facto* arrest . Here, unlike the individual challenging the constitutionality of her detention in Muehler, Maddox was not a mere innocent occupant of the house being searched, detained as a result of unfortunate happenstance.  He was instead the primary suspect in a robbery investigation, and his presence during the execution of the search warrant presented a legitimate safety concern, as well as a risk that he would

---

[7] See [Doc. 32 at 8 (citing Summers, 452 U.S. at 702-703)]; United States v. Phillips, 812 F.2d 1355 (11th Cir. 1987) (per curiam).  However, contrary to the thrust of Maddox''s argument, the police are not required to ignore the practical needs of the investigation when detaining individuals present during the execution of a search warrant: "[t]he reasonableness of a detention may be determined in part by 'whether the police are diligently pursuing a means of investigation which is likely to resolve the matter one way or another very soon.'" Summers, 452 U.S. at 701 n.14 (citing 3 W. LaFave, Search and Seizure § 9.2, p. 40 (1978)).

flee or interfere with the search.[8]  See Muehler, 544 U.S. at 98; Bautista, 684 F.2d 1286
at 1288.

Securing Maddox in a patrol car was a reasonable course of action considering
the size of the house, the number of residents detained during the search (seven), the
ratio of detainees to officers (better than 1:2 in favor of the detainees),[9] the risk that
he may flee, and the potential for having access to concealed weapons or evidence
if allowed to remain in the house.[10]  See Muehler, 544 U.S. at 98; Manbeck, 744 F.2d
360 at 377.  Moreover, creating an opportunity to interview either King or Maddox
in a quiet location outside the search site was a reasonable means of accomplishing
the objectives of the search warrant since either Maddox or King could facilitate the

---

[8] It should be noted that in Muehler, the Supreme Court upheld the
reasonableness of handcuffing an innocent occupant for two to three hours in light
of the fact that she was in a gang house, officers were searching for weapons and a
wanted gang member, and there were many individuals present in the house at the
time the warrant was executed.  544 U.S. 93.

[9] Maddox argues in his brief that he and King could have been "sequester[ed]
. . . with their other relatives under the supervision of the ten other officers present
on the scene" without impacting the safety or efficiency of the search, but this
argument ignores the fact that many of the officers on scene would have been
needed to conduct an orderly and efficient search of the residence.  [Doc. 32 at 8].
It also fails to consider that the officers would have a compelling reason to separate
suspects from non-suspects, and subject the two groups to different levels of
restraint and supervision.  See, e.g., Muehler, 544 U.S. at 98.

[10] Inspector Greenberg testified that "the Attucks Boulevard house was in total
disarray."  [Tr. at 50].

search by telling officers where the items listed in the warrant could be located.  See Summers, 452 U.S. at 703.  Indeed, Inspector Greenberg's interview of King led agents straight to the ring they were seeking without having to conduct additional time-consuming and invasive searching of the premises.  Under the facts presented, and in light of relevant precedent, handcuffing and securing Maddox in the back of a police vehicle was a reasonable means of detaining him while officers searched the residence and conducted interviews, and his detention was not prematurely elevated to an arrest by these additional restraints.

### 3.      *Probable cause for arrest*

Even if the Court found that Maddox's detention amounted to an arrest when he was handcuffed and placed in the back of a police car, a *de facto* arrest under these circumstances was supported by probable cause.  Law enforcement officers may constitutionally make a warrantless arrest where they have probable cause to believe a suspect has committed a crime.  Devenpeck v. Alford, 543 U.S. 146, 152 (2004); Beck v. Ohio, 379 U.S. 89, 91 (1964).  Probable cause to arrest exists "when an arrest is 'objectively reasonable based on the totality of the circumstances.'"  McCormick v. City of Ft. Lauderdale, 333 F.3d 1234, 1243 (11th Cir. 2003) (per curiam) (quoting Lee v. Ferraro, 284 F.3d 1188, 1195 (11th Cir. 2002).  See also  Rankin v. Evans, 133 F.3d 1425, 1435 (11th Cir. 1998).  The standard of objective reasonableness "is met

when 'the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'"  Rankin, 133 F.3d at 1435 (quoting Williamson v. Mills, 65 F.3d 155, 158 (11th Cir. 1995) (per curiam)); Beck, 379 U.S. at 91 ("Whether [an] arrest [is] constitutionally valid depends in turn upon whether . . . at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense."); United States v. Street , 472 F.3d 1298, 1305 (11th Cir. 2006 ).

Probable cause is a "fluid concept -- turning on the assessment of probabilities in particular factual contexts."  Illinois v. Gates, 462 U.S. 213, 232 (1983).  Prior to making an arrest, an officer need not prove all elements of a crime beyond a reasonable doubt, nor do all facts supporting probable cause at the time of arrest need to be admissible according to the rules of evidence.  Adams v. Williams, 407 U.S. 143, 149 (1972) ("Probable cause does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction.") (citation omitted); Brinegar v. United States, 338 U.S. 160, 170 n.12 (1949.  Moreover, an officer need not resolve all inferences and factual conflicts in

favor of the suspect.  "An officer's decision to arrest a suspect may be objectively reasonable even though that officer has not specifically discarded every possible non-criminal explanation for the conduct that forms the basis for her decision to arrest a suspect."  Bailey v. Bd. of County Comm'rs of Alachua County, Fla. , 956 F.2d 1112, 1120 n.5 (11th Cir. 1992)  (citing United States v. Pantoja-Soto, 739 F.2d 1520, 1524 (11th Cir. 1984)).

Inspector Greenberg had probable cause to arrest Maddox when he arrived at the residence to execute the search warrant.  Over the course of several days of investigation and surveillance, Inspector Greenberg had gathered sufficient evidence and information that a reasonable person would believe that Maddox had committed the robbery.[11]  Beck, 379 U.S. at 91.  This was true even before the ring was recovered from the bedroom. The fact that Inspector Greenberg wished to recover the ring before making a formal arrest, whether out of an abundance of

---

[11] When Inspector Greenberg arrived at the residence, he already knew: 1) Maddox owned a truck positively identified as the one parked in the lot adjacent to the crime scene on the night of the robbery; 2) dogs had tracked the robbers' trail to this lot; 3) Maddox knew the victim's route and procedures, and the victim did not rule him out as one of the robbers; 4) the proceeds from the robbery included a bag of cash in $100 and $20 bills; 5) Maddox and King bought a new car, without test driving it, only days after the robbery, paying for it entirely in $100 and $20 bills taken from a bag of cash; 6) after the robbery, King, who had not previously been known to have an engagement ring, was seen wearing a distinctive handcrafted ring taken during the robbery and positively identified by its owners; and 7) neither Maddox or King were employed, and neither had obtained credit or financing to pay for the car or the ring.

caution, or whether simply as a tactical investigative decision, is irrelevant as to the legality of the arrest because Inspector Greenberg had sufficient probable cause to arrest Maddox upon arriving at the Attucks Blvd. residence on the morning of the search.

Maddox argues that the ring is the "lynchpin" of probable cause for his arrest, and that Inspector Greenberg, as a non-expert regarding jewelry, was not qualified to make a determination as to the identity of the ring.  [Doc. 32 at 9].  However, expert testimony or special qualification is not required in determining probable cause.  See Brinegar, 338 U.S. at 170 n.12.  Furthermore, the identity of the ring was only one of several items of information and evidence supporting probable cause here, and therefore probable cause would not be vitiated even if the ring were never recovered.

Maddox also argues that the government had insufficient information to establish probable cause because they never engaged in a "definitive accounting" of his and King's financial condition prior to concluding that the purchase of an $8,000 vehicle was suspicious.  However, Inspector Greenberg did in fact make inquiries into both Maddox and King's work history, credit history, and earnings sufficient to conclude that neither appeared to have the ability to purchase the vehicle with cash. (Gov. Ex. 10 at 4-5). Furthermore, no "definitive accounting" was

19

required to support probable cause, so long as all of the facts and circumstances would lead a reasonable officer to conclude that Maddox had committed a crime. Beck, 379 U.S. at 91; Adams, 407 U.S. at 149; McCormick, 333 F.3d at 1243.

Finally, Maddox argues that a "cash purchase . . . made in $20 and $100 bills is completely unremarkable." [Doc. 32 at 10]. While this may generally be true for ordinary purchases, purchasing an $8,000 vehicle in cash with $20 and $100 bills taken from a bag of cash certainly contributes to the finding of probable cause, particularly when considered with the other evidence gathered by the Postal Inspectors tying Maddox to the robbery. The purchase of the vehicle was simply one piece of the totality of circumstances and does not stand alone as the sole foundation supporting probable cause for Maddox's arrest. See Gates, 462 U.S. at 229. Furthermore, the possibility of an innocent explanation did not remove this otherwise suspicious purchase from Inspector Greenberg's consideration in assembling sufficient probable cause to make the arrest. See Bailey, 956 F.2d at 1120 n.5.

In sum, Maddox's detention during the execution of the search warrant was legally permissible and he was not subjected to unreasonable restraint by being handcuffed and placed in the back of a police vehicle. His arrest at the scene of the search warrant execution was supported by probable cause whether it occurred at

the moment he was first handcuffed, or  whether it occurred later when he was

formally placed under arrest and transported to the USPIS office to be interviewed.

It is therefore **RECOMMENDED** that Maddox's motion to suppress evidence or

statements on grounds that he was illegally detained or arrested, [Docs. 19 & 20], be

**DENIED**.

### B.    Consent search and seizure of evidence from mother's home

Maddox argues that the search of the Windmill Road residence was without

a warrant or valid consent, and therefore the seizure of evidence (the Nike Air Force

One tennis shoes) from that location was illegal and this evidence should be

suppressed.  [Doc. 20 at 2; Doc. 32 at 10].  Specifically, Maddox asserts that since

"Inspector Greenberg knew at the time that [Maddox] was living with his wife at the

Attucks Boulevard residence and that the home belonged to [Maddox's] mother, he

could not have reasonably believed that [Maddox] had the right to consent to a

search of the home." [Doc. 32 at 10].  The government argues in response that

Maddox had actual authority to consent to the search, or at a minimum, the officers

reasonably relied on his apparent authority to consent to a search of a residence in

which he maintained a room of his own.  [Doc. 33 at 5].

The Fourth Amendment protects "[t]he right of the people to be secure in their

persons, houses, papers, and effects, against unreasonable searches and seizures."

U.S. Const. amend. IV.   "It is well settled under the Fourth and Fourteenth Amendments that a search conducted without a warrant issued upon probable cause is 'per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions.'"   Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973) (quoting Katz v. United States, 389 U.S. 347, 357 (1967) & Coolidge v. New Hampshire, 403 U.S. 443, 454-455 (1971)).   "One of the well-established exceptions to the probable cause and warrant requirements is a search which is conducted pursuant to voluntary consent."   United States v. Garcia, 890 F.2d 355, 360 (11th Cir. 1989).[12]

The record here establishes that Maddox's consent to search his room at the Windmill Road residence was freely and voluntarily given.[13]   When Inspector Greenberg asked Maddox for consent to search his room at the Windmill Road residence, Maddox verbally gave consent.   (Tr. at 26).   Maddox listened while Inspector Greenberg read to him the USPIS Consent to Search form, stated that he

---

[12] "In order for consent to a search to be deemed voluntary, it must be the product of an essentially free and unconstrained choice."   Garcia, 890 F.2d at 360.

[13] Maddox has not argued in his brief that his consent to search was a product of coercion, only that the consent could not have been valid where officers knew that the house belonged to his mother.  [Doc. 32 at 10-12].  Furthermore, since evidence was only seized in his room, the brief search of the attic and garage consented to by Maddox while at the residence is not relevant to the motion to suppress evidence, [Doc. 20].

understood what Inspector Greenberg had read to him, then signed the form.  (Tr.

at 25-26; Gov. Ex. 8).  Maddox was not under any unduly coercive pressure, being

seated in an interview room with two agents who had not threatened him or made

any promises, and who had previously been conducting a non-confrontational

interview.  (Tr. at 23-24).  Cf. United States v. Espinosa-Orland, 704 F.2d 507, 512

(11th Cir. 1983) (consent still valid where voluntarily given even where four officers,

one with a gun drawn, surrounded suspect while asking for consent).  The Postal

Inspectors also made efforts to ensure that Maddox could withdraw his consent at

any time by stationing an inspector with him while other inspectors searched.  (Tr.

at 51-52).

Maddox argues that his consent to search his bedroom at his mother's house

was not valid because Inspector Greenberg "could not have reasonably believed that

[he] had the authority to license officers to search his former bedroom."  [Doc. 32 at

11].  However, based on his investigation and interview, Inspector Greenberg had

numerous reasons to believe that Maddox had authority to consent to a search of at

least his bedroom and common areas of the home:  Maddox told Inspector

Greenberg that he had his own bedroom at the Windmill Road residence, that he

had stayed there for the last week, that he had a key, and that he knew the alarm

code.  (Tr. at 29, 49).  Furthermore, Inspector Greenberg knew that Maddox was

23

getting mail at the residence, the surveillance team had seen Maddox's vehicle at the residence, and had seen Maddox leaving. (Tr. at 25, 47-49). Given all of this information, even if Maddox in fact lacked actual authority to consent,[14] it was objectively reasonable for Inspector Greenberg to conclude that Maddox had authority over his own room and common areas of the premises as a cohabitant along with his mother. See United States v. Brazel, 102 F.3d 1120, 1148 (11th Cir. 1997). Thus, Inspector Greenberg's search was legal. See Illinois v. Rodriguez, 497 U.S. 177, 186-88 (1990); Brazel, 102 F.3d at 1148. It is therefore **RECOMMENDED** that Maddox's motion to suppress evidence seized from the Windmill Road residence on grounds that the consent to search those premises was not validly obtained, [Doc. 20], be **DENIED**.

## C.   Admissibility of statements under Miranda

Maddox moves to suppress statements he made during the custodial interrogation as a violation of his Fifth Amendment right against self incrimination. [Doc. 19 at 2-3]. Since Maddox made no statements prior to being interviewed while

---

[14] Though neither of the parties' briefs address the issue, if Maddox lacked actual authority to consent, as he argues, then he also lacks standing to contest the legality of the search, having no legitimate expectation of privacy in any area of the Windmill Road residence. See, e.g., United States v. Jones, 184 Fed. App. 943 (11th Cir. 2006) (per curiam) (unpublished) (defendant lacked standing to challenge search of a residence where defendant denied that he lived at a residence and claimed he lacked authority to consent to a search thereof) (citing United States v. Sweeting, 933 F.2d 962 (11th Cir. 1991)).

24

in custody at the USPIS office, (Tr. at 14, 46-47), and the parties have not disputed the fact that he was in custody at the time of his interview, the only issues are whether Maddox was properly advised of his rights and properly waived those rights.

"*Miranda* warnings are required before any statement may be admitted into evidence at trial which was elicited from a person in custody through interrogation." United States v. Adams, 1 F.3d 1566, 1575 (11th Cir. 1993) (internal marks and citation omitted). In Miranda, the Supreme Court acknowledged that custodial interrogations, by their very nature, create "compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." 384 U.S. at 467. Therefore, to address this inherent compulsion and protect a suspect's Fifth Amendment privilege against self-incrimination, Miranda established certain procedures officers must follow. Specifically, prior to the initiation of questioning, officers must fully advise the suspect of the government's intention to use his statements to secure a conviction, and must inform him of his rights to remain silent and to "have counsel present . . . if [he] so desires." Id. at 468-70. Miranda further requires that law enforcement respect the suspect's decision to exercise his rights as outlined in the warnings. "If the individual indicates in any manner, at any time prior to or during questioning,

that he wishes to remain silent, the interrogation must cease." Id. at 473-74. "If the individual states that he wants an attorney, the interrogation must cease until an attorney is present." Id. at 474.[15]

A defendant may waive his rights if the waiver is made voluntarily, knowingly, and intelligently. Id. at 444. This inquiry has two distinct dimensions:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

United States v. Patterson, No. 1:06-CR-500-1-TWT, 2007 WL 2331080, at *3 (N.D. Ga. Aug. 10, 2007), adopted at *1 (quoting United States v. Barbour, 70 F.3d 580, 585 (11th Cir. 1995)). See also Moran v. Burbine, 475 U.S. 412, 421 (1986); Edwards v. Arizona, 451 U.S. 477, 482 (1981); Fare v. Michael C., 442 U.S. 707, 725 (1979); Schneckloth, 412 U.S. at 226. The voluntariness analysis often depends on whether

---

[15] The defendant bears the burden of establishing that he was in custody and that his statements were made in response to government questioning. See United States v. de la Fuente, 548 F.2d 528, 533 (5th Cir. 1977). The government bears the burden of proving that the defendant's statements were voluntarily given. Colorado v. Connelly, 479 U.S. 157, 168 (1986). See also Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) (decisions of the Fifth Circuit rendered before October 1, 1981, are binding precedent in the Eleventh Circuit).

"the defendant's will was overborne." <u>Lynumn v. Illinois</u>, 372 U.S. 528, 534 (1963). Thus, to find a waiver involuntary, "coercive police activity is a necessary predicate." <u>Connelly</u>, 479 U.S. at 167. <u>See also</u> <u>Moran</u>, 475 U.S. at 421 ("[T]he relinquishment of the [<u>Miranda</u>] right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception."). Therefore, "in the absence of police coercion, a court cannot conclude a defendant's waiver or inculpatory statements are involuntary." <u>United States v. Minard</u>, 208 Fed. App. 657, 660 (10th Cir. 2006) (unpublished).

"A valid waiver, however, requires more than just a finding of voluntariness. In addition to being voluntary, a waiver of *Miranda* rights must also be knowing and intelligent." <u>Id.</u>  In contrast to a finding of voluntariness, the court "need not find coercion in order to find a defendant's waiver unknowing or unintelligent." <u>Id.</u> (citation omitted).  "No single factor is necessarily determinative of the issue whether a defendant knowingly and intelligently waived his rights but the court must engage in a fact-specific inquiry based on all of the circumstances." <u>Patterson</u>, 2007 WL 2331080, at *3.  "[T]he totality of the circumstances must demonstrate a defendant waived his rights with a 'requisite level of comprehension.'" <u>Minard</u>, 208 Fed. App. at 660 (quoting <u>Moran</u>, 475 U.S. at 421).  However, an express oral or written waiver of <u>Miranda</u> is strong proof of the validity of the waiver.  <u>United</u>

27

States v. Stephens, 202 F. Supp. 2d 1361, 1370 (N.D. Ga. 2002).  See also North

Carolina v. Butler, 441 U.S. 369, 373 (1979).

    As indicated earlier, "'[a] waiver is knowing and intelligent only if it was

made with a full awareness of both the nature of the right being abandoned and the

consequences of the decision to abandon it.'"  United States v. Wattree, 544 F. Supp.

2d 1262, 1274 (D. Kan. 2008) (quoting Minard, 208 Fed. App. at 660) (internal marks

omitted).  Thus, "'[a] defendant need not . . . understand all the consequences of the

waiver.  He need only understand his right to remain silent or have his statements

used against him.'"  Id. at 1274-75.  The government bears the burden of proving by

a preponderance of evidence that Maddox validly waived his Miranda rights.

United States v. Chirinos, 112 F.3d 1089, 1102 (11th Cir. 1997).  See also Connelly, 479

U.S. at 168-69.

    The government asserts that Maddox knowingly waived his rights, and

displayed a willingness to be interviewed based on his cooperation with the Postal

Inspectors, and his responsiveness to questions asked.  [Doc. 27 at 20-21].  Maddox

does not argue that he was coerced into signing the Miranda advisement form or

that he lacked the requisite level of comprehension, and the totality of the

circumstances demonstrates that Maddox knowingly, intelligently, and voluntarily

waived his Miranda rights.

All the evidence in the record shows that Inspector Greenberg properly informed Maddox of his rights and that Maddox understood what those rights were. Inspector Greenberg read the five bulleted sentences to Maddox from the USPIS <u>Miranda</u> advisement form, the text of which mirrors all advisements required by the <u>Miranda</u> decision.  <u>Compare</u> 384 U.S. at 468-72 <u>with</u> (Gov. Ex. 7).  Maddox indicated his understanding of these rights both by verbally saying "yes" when asked if he understood each right as read, and by signing the form below the sentence, "I have read this statement of my rights (This statement of my rights has been read to me) and I understand what my rights are."  Maddox had no questions about the form, did not appear to have any problems understanding Inspector Greenberg, and did not ask for an attorney.  (Tr. at 22).[16]

Maddox waived his rights by signing below the sentence "I am willing to discuss subjects presented and answer questions.  I do not want a lawyer at this time.  I understand and know what I am doing.  No promises or threats have been made to me and no pressure or coercion of any kind has been used against me."  (Tr.

---

[16] Whether a suspect intelligently waived his rights depends on the particular circumstances in a case, including the background, experience, and conduct of the defendant; the defendant's age; familiarity with the criminal justice system; and his demeanor and conduct during the interrogation.  <u>See</u> <u>Edwards</u>, 451 U.S. at 482; <u>Coleman v. Singletary</u>, 30 F.3d 1420, 1426-27 (11th Cir. 1994).  The evidence shows that Maddox was an adult who was familiar with the criminal justice system, (Tr. at 22-23), and there is no evidence that he was under the influence of drugs or alcohol during the questioning.

at 20-22; Gov. Ex. 7).  No weapons were drawn while Maddox was read his rights and signed the form, no one threatened or intimidated him, and there is no evidence that anyone deceived Maddox or made any promises to induce him to sign the form. (Tr. at 20-24).  See Connelly, 479 U.S. at 167.  He then gave responsive answers to Inspector Greenberg's questions without objecting or asking for a lawyer.  (Tr. at 23-24).

Maddox raises the fact that a second Miranda warning was not given before the second phase of the interview was initiated.  [Doc. 32 at 6].  However, a second warning under these circumstances was not required.  See United States v. Contreras-Cortez, 41 Fed. App. 252, 254 (10th Cir. 2002) (unpublished) ("The mere passage of time does not invalidate a prior warning; rather, the test is whether the circumstances have changed so significantly that the defendant's answers are no longer voluntary or the defendant is no longer knowingly and intelligently relinquishing his rights.").  Here, Inspector Greenberg's second phase of interviewing Maddox occurred within a few hours of the initial waiver, in the same place, conducted by the same agents, under the same circumstances, and was part of a continuing process during which Maddox was continuously in the presence of the Postal Inspectors.  See Id. ("According to the record, the same agents conducted the two interrogations, which were carried out in virtually the same manner.").  Nothing in the facts suggests that either the Miranda advisements were defective or

that Maddox's waiver of those rights was anything but knowing, intelligent, and voluntary.  It is therefore **RECOMMENDED** that Maddox's motion to suppress statements on grounds that they were obtained in violation of his Fifth Amendment privilege against self-incrimination, [Doc. 19], be **DENIED**.

### III.  CONCLUSION

For the foregoing reasons and cited authority, the undersigned **RECOMMENDS** that the motions to suppress evidence and statements, [Docs. 19 & 20], be **DENIED**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, certified Ready for Trial.

**IT IS SO ORDERED AND RECOMMENDED**, this 7th day of September, 2010.

_Russell G. Vineyard_
RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE

31